THE PEOPLE *ex rel.* Andrew L. Rogers

*v.*

ALBIN CALDWELL.

*Filed at Springfield November 2, 1892.*

1. TAXATION—*where personal property should be taxed.* A party having a farm situate partly in one county and partly in another, is taxable on his personal property in the county in which he has his actual residence, no matter what may be his motive for choosing one county in preference to the other.

2. At common law, personal effects follow the owner, and have their *situs* with him or at his domicile for many purposes, including that of taxation. A personal property tax is to be assessed against the owner at the place of his residence, except so far as the rule may be changed by statute.

3. SAME—*where live stock should be assessed.* Where a man pastures his cattle on his own land in another county than his residence, and feeds out his grain there through his hired hands, after which he moves them to his home farm, such cattle should be assessed against him at the place of his residence, and not in the other county. Section 9 of the Revenue law does not apply in such case, as the cattle are within his control all the time, and the hired man is not his agent.

4. SAME—*live stock connected with a farm in different townships or counties.* Section 8 of the Revenue law, which requires live stock connected with a farm upon which the owner does not reside to be assessed in the district where such farm is situated, does not apply where the farm on which the stock is kept lies in several districts or two different counties, and the stock passes from one part of the farm to another. A farm may consist of any number of acres, of one or many fields, and may lie in one township or county, or in more than one.

WRIT OF ERROR to the Circuit Court of Piatt county; the Hon. EDWARD P. VAIL, Judge, presiding.

Mr. M. R. DAVIDSON, and Mr. JAMES HICKS, for the plaintiff in error:

That personal property for taxing purposes may obtain a *situs* of its own, see *First Nat. Bank* v. *Smith,* 65 Ill. 44; *Munson* v. *Crawford,* id. 185; *Irvin* v. *Railroad Co.* 94 id. 109; *Selz* v. *Cagwin,* 104 id. 647; *Dalby* v. *People,* 124 id. 66.

Mr. W. E. LODGE, for the defendant in error:

A man may elect where he will live, and having made his election, the law fixes where his property shall be taxed. When a line runs through a man's house he must be taxed in the town where the most necessary part of the house is—the living rooms. (*Judkins* v. *Reed,* 48 Me. 386; *Cheney* v. *Waltham,* 8 Cush. 327.) He must be taxed where his actual inhabitancy is. *Lyman* v. *Fish,* 17 Pick. 231; Story on Conflict of Laws, sec. 47; Cooley on Taxation, 269.

To authorize the assessment of any property in another county from the one in which the owner resides, it must appear that the property is kept and maintained there, and is not there temporarily. *People* v. *Niles,* 35 Cal. 282; *Oakland* v. *Whipple,* 59 id. 112.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

This was a bill in chancery, in the Piatt circuit court, by defendant in error, against the county clerk of Piatt county, praying that said clerk be enjoined from extending upon the tax books of the county a personal property tax against complainant, upon an assessment of personal property returned by the assessor of Sangamon township, in said county, for the year 1890, as the personal property of complainant in said township liable to taxation, at a valuation of $11,381. A temporary injunction was issued, and an answer filed deny-

ing the material allegations of the bill. Upon hearing, the circuit court entered a decree making the injunction perpetual.

No extended statement of the pleadings is necessary. It is conceded that the issues are properly presented, and they are sufficient to sustain the decree if otherwise warranted.

It appears that Caldwell was the owner of three farms, aggregating sixteen hundred acres, two of which are situated wholly in Piatt county, and one, of which seven hundred and ten acres is in Piatt and one hundred and ninety acres in Champaign county. These lands were largely devoted to pasturage, although considerable portions were in cultivation. One of the farms, known as the "Sangamon River farm," was occupied by adult daughters of Caldwell, who, it is claimed, owned and listed for taxation the property used on that farm. Another, known as the "Wabash farm," Scott Record lived upon, and worked by the year for Caldwell, taking care of and feeding his stock while there. One of these farms had upon it a good house, large barn, stock scales, etc., and it would appear that it had, at one time, at least, been the residence of Caldwell. In 1886 Caldwell built a house on the land in Champaign county, near the line, and, as he claims, then moved into it and has ever since occupied it as his residence, and that since the spring or summer of 1886 his actual residence has been on said land in Champaign county, and that the personal property assessed by the assessor of Sangamon township, in Piatt county, was liable for taxation only in Champaign county, that being the place of his domicil. To this it is answered: First, that his residence is not in Champaign county, but in Piatt county, and that his pretense of occupying the house on the land in Champaign county is fraudulently made, to escape the listing and taxation of his personal property in Piatt county, for the reason that the rate of taxation is higher in the latter than in the former; and second, that if it be conceded that his residence was in Champaign county, yet the property assessed, and upon which the

extension of the tax is sought to be enjoined, had its *situs* in Sangamon township, in Piatt county, for the purposes of taxation.

It would seem that much of the personal property of the complainant had, in previous years, been listed by him in Champaign county, where, as shown, the rate of taxation was less than in Piatt county, and it does not seem improbable that this cause may have led Caldwell to change his abode, and claim his residence in the former county. Be that as it may, it seems clear that from 1886 down he claimed to reside in the dwelling house upon the land in Champaign county. He lived there with his wife, at least part of the time, claimed it was his home, voted in that township, and did many acts indicative of his intention to make it his place of domicil. We have carefully considered all of the evidence, and think the chancellor fully warranted in finding that his place of residence on the first day of May, 1890, and for several years prior thereto, had been upon the land constituting part of what is known as the "Champaign farm," and in Scott township, in Champaign county. His motive for selecting this domicil can not be important. If he actually resided in Champaign county the same legal consequences would result, whatever may have been his motive for choosing it.

At the common law, personal effects followed the owner, and had their *situs* with him, or at his domicil, for many purposes, including that of taxation. Thus it is said: "A tax assessed against the person for personal estate is to be assessed to him at the place of his residence, because, in the contemplation of the law, his movable property accompanies him wherever he goes." (Cooley on Taxation, 269.) Section 7 of our Revenue act (chap. 120) provides: "Personal property, except such as is required in this act to be listed and assessed otherwise, shall be listed and taxed in the county, town, city, village or district where the owner resides." Having found the residence of Caldwell to be upon that portion of

his land lying in Champaign county, it followed, necessarily, that his personal property was to be there listed, unless it fell within some exception to that general rule, and "is required to be listed and assessed otherwise" by some provision of the statute.

All of the property in question was by Caldwell, on the first day of May, 1890, listed to and assessed by the assessor of Scott township, Champaign county, the same then being upon the "Champaign farm." On the 19th day of May, 1890, the assessor of Sangamon township, Piatt county, claiming that the property was liable to be assessed in that township, came upon the farm known as the "Champaign farm," and scheduled five hundred and eighty-five head of cattle, fifty-four horses, six wagons, and a lot of agricultural implements, of the aggregate value of $11,381, and returned the same to the county clerk, etc. No question arises as to the identity of this property with the property listed to the Scott township assessor, except, perhaps, four horses were included in the last assessment belonging to persons other than Caldwell, who were working for him with their teams. It also appears, and is not controverted, that Record, as the agent of Caldwell, about the first day of May listed to Phalan, assessor of said Sangamon township, Piatt county, for Caldwell, eleven horses, five cows, fifty-five hogs, carriage and agricultural tools and implements and grain on the Piatt county farms, aggregating, as valued by the assessor, $1044, which was as claimed by Caldwell and his agent, all of the personal property of Caldwell used and permanently kept upon said Wabash and Sangamon river farms, or either of them. The tax extended upon this assessment, as well as that extended upon the assessment of the property in question in Scott township, Champaign county, was paid.

It appears, also, and is practically uncontroverted in the evidence, that of the cattle assessed by the Sangamon township assessor May 19, one hundred head, known as the "Mis-

souri cattle," had been purchased by Caldwell in the fall of
1889, and shipped *via* the Wabash railway to the "Wabash
farm," so called, unloaded there, and fed on that farm during
the winter of 1889-90, and, upon the feed giving out, in April
were removed to the "Champaign farm," and kept there until
in November, 1890, when they were marketed. Both Cald-
well and Record, who was called as a witness by plaintiff in
error, testified to their removal in April, and that the reason
therefor was that the feed at that farm had been fed out, and
that they were never returned to the "Wabash farm" except
*in transitu* in shipping them. Other stock was purchased in
Chicago, which were on hand May 1, 1890, but they were
shipped *via* the Illinois Central railroad, and unloaded at the
switch at or near the "Champaign farm," and remained there
until sometime in May, 1890, when they were taken, some of
them, to pasture on the "Wabash farm," and turned out. It
would seem clear that they were still on the Champaign farm
as late as the 19th of May, when they were assessed by the
Sangamon township assessor. He found them mostly on the
Piatt county land, belonging to the "Champaign farm," only
a few of the cattle and some hogs, and perhaps horses, being
on the land in Champaign county. There was no fence on
the county line, so that stock passed back and forth at will,
or were turned into fields as suited the convenience of Cald-
well.

It is apparent that Caldwell, owning these farms, used them
with the feed raised thereon and purchased by him, as might
seem most convenient and profitable in the handling, feeding
and fattening of his stock. We are referred to the 9th section
of the Revenue act, (chap. 120,) and to *Dalby* v. *The People*,
124 Ill. 66, as controlling this case. Section 9 is as follows:
"The property of manufacturers and others in the hands of
agents shall be listed and assessed at the place where the
business of such agent is carried on." It is apparent that
this section of the statute could, in any event, apply only to

the property in Record's keeping upon the "Wabash farm" prior to May, 1890. But it could not, we think, apply to them. The case is clearly distinguishable from *Dalby's case.* The stock in controversy was not in the hands of Record on the first of May, when all property is required to be listed. (Secs. 5, 19, chap. 120.) The evidence shows, both that of Caldwell and Record, and is undisputed, that the stay of the stock at the "Wabash farm" was temporary, merely, until the feed accumulated there was consumed, when, as before seen, they were taken to the "Champaign farm," before the first of May, to be cared for and fed. Dalby had no farm. His cattle were in another township from where he resided, at a distillery, being fed, on the first of May, and were there listed for taxation by the agent, as he was required by law to do, and it was held that Dalby was bound thereby. But here they were fed upon Caldwell's own farm, on his own feed, by a hired hand, and were in Caldwell's possession and control. As said in *Dalby's case,* the provision of the statute for taxing property in the hands of the agent is for the purpose of subjecting all the taxable property of the State to taxation; and if it could be seen that a complainant was fraudulently endeavoring to arrange his property so that it might escape its just share of the public burthen, a court of equity, ever requiring those seeking its aid to come with clean hands, would refuse its protection against an assessment, however wrongful.

But it is said that it is a fraud upon the tax-payers of Piatt county for Caldwell to fatten his stock upon the rich pastures of the county and then list it for taxation elsewhere. Suppose that he should rent land in Douglas county, and keep his cattle there during the pasture season, would it be contended that therefore the property was taxable in Douglas? If he should devote his lands in Piatt county to grain raising, and haul and store his grain in Champaign county, would the fact that the rich lands of Piatt county produced it render it taxable there? Manifestly not.

But it is also claimed, that under the 8th section of the Revenue act (chap. 120) the stock was liable to be listed in Piatt county. It is as follows: "When the owner of live stock or other personal property connected with a farm does not reside thereon, the same shall be listed and assessed in the town or district where the farm is situated: *Provided*, if the farm is situated in several towns or districts it shall be listed and assessed in the town or district in which the principal place of business shall be." So far as the farms, other than the "Champaign farm," are concerned, what has been said applies. The property "connected" with the farms had been listed to the assessor of the township in Piatt county, and by him assessed.

It is, however, insisted, that on the first of May, and subsequently, the cattle assessed were in Piatt county, and kept, in the main, upon the lands of that county, and care is taken to show that when assessed by the assessor of Sangamon township, in Piatt county, they were actually running upon that portion of the "Champaign farm" lying in Piatt county, there being seven hundred and ten acres in that county and one hundred and ninety in Champaign. It seems clear that if section 8 can have any application it justified and required the assessment to be made in Scott township, Champaign county. That the farm was situated in two towns, and that the "principal place of business on such farm" was in Scott township, does not admit of question. But section 8 does not apply, unless the owner of the stock "does not reside" upon the farm with which they are "connected." A farm is, both by the standards and in common acceptation, defined to be a body of land, usually under one ownership, devoted to agriculture, either to the raising of crops, or pasture, or both. It is not understood to have any necessary relation to or to be circumscribed by political or congressional subdivisions. A "farm" may consist of any number of acres; of one quarter section, or less, or many quarter sections; of one field, or many

fields; may lie in one. township and county, or in more than one. And thus understanding the meaning of the word "farm," the witnesses in this case, and counsel on both sides, designate the nine hundred acres lying partly in Piatt and partly in Champaign county as "a farm;" and in this sense the language of section 8 must be understood, and having found that Caldwell resided on that farm, it was properly held that section 8 could have no application.

It seems clear that the property falling within none of the exceptions to the general rule established by section 7 of the Revenue act, that section would control, and the property be liable to assessment at the residence of the owner. It necessarily follows that the attempted assessment by the assessor of Sangamon township, in Piatt county, was without authority of law, and the extension of taxes thereon in Piatt county properly enjoined.

The decree of the circuit court will be affirmed.

*Decree affirmed.*