Tull W. Cooke, Appellee, v. Chicago, Ottawa & Peoria Railway Company, Appellant.

Gen. No. 7,098.

1. RAILROADS—*duty to erect cattle guards at road crossings.* A crossing on a road leading to a farm and used chiefly by persons going to and from such farm loses its character as a farm crossing within the meaning of Cahill's Ill. St. ch. 114, ¶ 78, requiring the erection of cattle guards and fences at road crossings, by the erection there of a waiting station by the owner of the farm under contract with the railroad which provided that certain cars should stop at such station to receive and discharge passengers and that the waiting room should be for the use of the farmer and the general public, where the undisputed evidence shows that the station and crossing were thereafter used by the general public of right, and such crossing is one which must be protected by cattle guards under the statute, either as a road crossing or as depot grounds.

2. RAILROADS—*injury to animals on right of way.* A railroad company is liable for injuries to a horse which got onto its right of way at a road crossing which the company was under duty to protect with cattle guards but which it had not guarded, even

though the horse was not actually struck by the car, where the motorman is shown to have been guilty of negligence and wilful misconduct by evidence that as the car approached the crossing the motorman saw the horse on the track and blew the whistle but did not slacken speed or stop, although the horse, frightened by the glare of the headlight and the car, continued to run down the track towards a trestle, and that the motorman did not stop the car until it reached the end of the trestle which the horse attempted to cross and was injured.

3. Appeal and error—*failure to point out error in brief as waiver.* The Appellate Court will not consider alleged error in giving an instruction where appellant fails to point out in its brief and argument wherein the alleged error exists or in what respect the instruction is defective.

Appeal from the Circuit Court of LaSalle county; the Hon. Edgar Eldredge, Judge, presiding. Heard in this court at the April term, 1922. Affirmed. Opinion filed August 5, 1922. Rehearing denied October 3, 1922.

Duncan & O'Conor, for appellant.

Lee O'Neil Browne, for appellee.

Mr. Justice Partlow delivered the opinion of the court.

Appellee, Tull W. Cooke, began suit against appellant, the Chicago, Ottawa and Peoria Railway Company, before a justice of the peace in La Salle county, to recover for injuries sustained by a horse belonging to appellee. There was a judgment in favor of the appellee for $74, and an appeal to the circuit court where there was a trial by jury and another judgment in favor of appellee for $74, and from that judgment this appeal was prosecuted.

The appellant was incorporated under the general railroad act and operated both passenger and freight cars and did a general railroad business. Between the City of Ottawa and the City of Marseilles the tracks of appellant extend east and west in almost a straight line. About four and one-half miles east of

Ottawa and two and one-half miles west of Marseilles, on the south side of the right of way of appellant, with a frontage of about a mile, was the farm of Dwight E. Cooke, brother of Tull W. Cooke, the appellee. Cooke had owned this farm for six years prior to July 31, 1919. For many years prior to the time the railroad was built, the land had been owned by a man by the name of Douglas. Immediately north of the right of way, a public highway extended parallel with the right of way the entire frontage of the Cooke farm. This highway was one of the thoroughfares connecting the cities of Marseilles and Ottawa. Before the railroad was built, when Douglas owned the farm, it was bounded on the north, its entire frontage, by this public highway, and when the railroad was built, the right of way was taken off of the north frontage of the farm. The farm buildings were south from the highway about 1,000 feet, and there was a road extending from the buildings north to the public highway, passing through a gate in the north fence. This road was the only means of ingress and egress to and from the farm, except upon the waters of the Illinois river which flowed along the south boundary of the farm. After the railroad was built, the appellant constructed a farm crossing over its right of way connecting the north end of the road from the house with the public highway, and constructed a gate on each side of the right of way, one gate being at the north side of the crossing, opening into the highway, and the other being on the south side and opening into the farm lands. This crossing consisted of planks inside and outside of each rail, the space between the planks and on each side of the rail being filled with dirt and rock. The north gate into the public highway from appellant's right of way was seldom closed by Cooke or by employees of appellant. Immediately north of this highway and parallel with it was the Illinois and Michigan canal, and to the north of the

76        Appellate Courts of Illinois.

Cooke v. Chicago, Ottawa & Peoria Ry. Co., 226 Ill. App. 73.

canal was the right of way of the Chicago, Rock Island and Pacific Railway Company.

After appellant's railroad was built, there was a station, or "stop," at this crossing, known as Douglas, and cars stopped on signal to take on or let off passengers. Soon after Dwight E. Cooke bought the farm, he entered into a written contract with appellant by which Cooke was permitted to erect a substantial waiting room on the south side of the crossing. This building was 10x10 feet in dimensions, built of split faced field stone, upon a foundation of boulders, and had two windows and a door. The appellant paid for the wooden roof on the building and Cooke paid all other expenses of erecting the same, but the work was done under the supervision of the engineer for the appellant. The building stood partly on the Cooke land and partly on the right of way, and was south and immediately west of the crossing. After the shelter was erected, there were no cattle guards, wing gates or other obstructions at the crossing to prevent stock on the crossing from going east or west down the track. West of the crossing 120 rods was a deep gully crossed by a wooden, skeleton trestle composed of eyebeams and ties. This trestle was fifteen feet east and west and the gully was six to eight feet deep.

On July 31, 1919, appellee returned home from Marseilles in his machine about 8:30 p. m. He passed over the crossing and opened the gate on the south side, which gate was made of iron and was fastened with a wooden fastener which worked on a bolt. Appellee testified that after passing through the gate he was very particular about closing and locking it. Thereafter no one from the Cooke farm passed through this gate until after the accident in question. About 9:30 p. m. an interurban passenger car belonging to appellant, going west, approached this crossing from the east. It had an electric headlight. The car whistled sharply several times as it approached the crossing, and this

SECOND DISTRICT—AUGUST, 1922.       77

Cooke v. Chicago, Ottawa & Peoria Ry. Co., 226 Ill. App. 73.

whistling attracted the attention of appellee, his wife
and a man by the name of Carney, all of whom were
in Cooke's house. Several horses belonging to appel-
lee had escaped from the pasture through the gate at
the crossing and were on the right of way. As Cooke
and his wife and Carney came out of the house they
saw the car, at the crossing, going west, about ten or
fifteen miles an hour, and three horses were running
rapidly in front of the car towards the trestle. Two
of the horses got off the track to the side of the right
of way and were not injured, but the third was driven
onto the trestle and its legs went through the trestle
and it was badly bruised and injured. It floundered
off of the trestle and to the side of the right of way
where appellee and Carney found it. As soon as ap-
pellee heard the whistle, he and his wife and Carney
got into an automobile and drove to the crossing,
where they found the gate about half open. They
crossed the interurban right of way and turned west
on the public highway on the north side of the tracks
and drove west to a point opposite the trestle. They
found the interurban car standing a short distance
east of the trestle, and the injured horse was on the
west side of the trestle on the north side of the tracks.
The motorman told appellee the horse had gone across
the trestle. The horse was treated by a veterinary
surgeon whose bill amounted to $49, and proof was
made that the appellee was deprived of the use of the
horse for twenty-five days and it was reasonably
worth $1.00 per day, making a total of $74, which con-
stituted the amount of the judgment.

There were no written pleadings, but it is conceded
that appellee's cause of action is based upon para-
graph 78, ch. 114, of the Statute (Cahill's Ill. St.
p. 2779), which requires cattle guards and fences at
certain specified places along the right of way of a
railroad so as to prevent stock from getting on the
right of way; also upon the alleged negligence and

wilful misconduct of the servants of appellant in charge of the car in driving the horse onto the trestle. On the other hand, it is the contention of appellant that its servants were not guilty of the negligent and wilful misconduct charged; also that the crossing was not a public crossing within the meaning of the statute, but was a farm crossing, and for that reason appellant was not required to establish cattle guards or wing fences.

The statute provides that every railroad shall, within six months after its line is opened for use, erect fences on both sides of its road, to prevent stock from getting on the railroad, except at crossings of public roads and highways, and within such portions of incorporated cities and villages as are laid out into lots and blocks, with gates or bars at farm crossings, and shall construct at all road crossings cattle guards suitable and sufficient to prevent stock from getting on such railroad. The term "farm crossing" as used in the statute means a crossing constructed for the use of the proprietors of land adjoining the railroad, and relates to lands used for agricultural purposes. *Williams v. Chicago & N. W. Ry. Co.*, 132 Ill. App. 274; *People v. Cleveland, C., C. & St. L. Ry. Co.*, 147 Ill. App. 141; *Illinois Cent. R. Co. v. Willenborg*, 117 Ill. 203; *People v. Caldwell*, 142 Ill. 434; *Chicago & A. R. Co. v. Sanders*, 154 Ill. 531; *Williams v. Chicago & N. W. Ry. Co.*, 228 Ill. 593. The terms "road crossing" and "public crossing" are used interchangeably, are synonomous and mean one and the same thing. If a crossing is not limited to the use of the adjacent land, but the public has a right to use it, and it is used by the public in general, then it is not a farm crossing but is a road crossing or public crossing. Whether or not appellant was required to construct cattle guards and wing fences at the crossing in question was a question of law for the court. *Illinois Cent. R. Co. v. Whalen*, 42 Ill. 396. The object of the statute was to

prevent injury to domestic animals, and to protect employees and the traveling public, and the statute should receive a liberal construction. *Illinois Cent. R. Co. v. Davidson,* 225 Ill. 618. Portions of incorporated cities and villages as are laid out into lots and blocks are exempt under the statute; and it has been held that other public places where public convenience forbids fencing are also exempt, including depot grounds, which are expressly exempt. *Chicago, B. & Q. R. Co. v. Hans,* 111 Ill. 114; *Chicago & E. I. R. Co. v. Guertin,* 115 Ill. 466; *Toledo, St. L. & K. C. R. Co. v. Franklin,* 159 Ill. 99. With reference to places where fences are not required, it has been held that cattle guards, connected with wing fences, must be placed at the terminus of the exempt portion of the right of way, so as to prevent stock from going onto that portion of the right of way which is required to be fenced. *Atchison, T. & S. F. R. Co. v. Elder,* 149 Ill. 173; *Toledo, St. L. & K. C. R. Co. v. Franklin,* 159 Ill. 99.

If the crossing in question was a farm crossing, merely for the convenience of the owners and occupants of the land upon which appellee lived, then appellant was under no obligations, under the statute, to put in cattle guards or wing fences, but all it was required to do was to fence its right of way and maintain gates on each side of the crossing. On the other hand, if this was a public or road crossing, or was a crossing used by the public in order to get to the shelter on the south side of the right of way, in either case it was the duty of the appellant to maintain cattle guards and wing fences.

At the time appellant's road was built, the crossing was a farm crossing within the meaning of the statute. The right of way was fenced on both sides and gates were established on each side of this crossing. The crossing was the only means of ingress and egress to and from the Douglas farm. The public in general had no right to use the crossing except in connection

with the Douglas farm, and while the stop was called "Douglas," and it might have been used to a certain extent by the public in getting on and off cars, yet this was not a general or public use so as to impose the duty on appellant of establishing cattle guards and wing fences. If this condition had not been changed, it would have continued to be a farm crossing, but after the conditions were changed another rule of law was applicable to the crossing. We think the principal change was by virtue of the contract entered into between the appellant and Dwight E. Cooke. The contract recited that "certain cars of said company receive and discharge passengers at a wayside stop, designated 'Douglas,'" and that "the licensee (Cooke) has petitioned said railway company for the license to erect a stone waiting room, immediately adjacent to the southerly right of way line of said railway company, at the said Douglas stop, which waiting room will be for the use and benefit of said licensee, his servants, his tenants and the *general public*." The undisputed evidence of the appellee was that both before and after this contract was entered into this was a stopping place at which passengers got on and alighted from cars, and that freight was put on and off at this place, and that when the canal was frozen over, or when the water was low enough for the people to cross the canal from the north, they got on and off at that stopping point. While it is true that the evidence shows that it was not a regular stopping place, and there was no ticket agent or expressman stationed there, yet we think the contract and the use of the station, as shown by the evidence, changed its character from a farm crossing to one in which the general public had a right, which neither the appellee nor the appellant could change, except as provided in the contract, and there is no evidence of such a change prior to the accident. It may be that very few people in that neighborhood could or did use the crossing, yet

that fact would not change the right of the public to use it. The right of the public to use it, rather than the extent to which that right was exercised, was the test as to whether it was a public crossing or a farm crossing. The public in general had a right to go through the gate on the north side, whether it was open or closed, in order that they might get to the station, and in order to get to the station it was necessary that they cross the tracks to the south side of the right of way near the gate which entered into the farm. Neither party had the right to deny the public the privilege of using this crossing as provided in the contract. The public nature of the crossing is further evidenced by the fact that the gate on the north side of the crossing remained open, with the knowledge of both the appellant and the appellee. With this gate open there was no protection for stock which might get on the right of way from the highway. The injured horse did not get onto the right of way through this gate, but we think the fact that it was usually open, tending to show that the crossing was for the use of the public as well as for the use of the Cooke farm, and was so intended by the appellant. When the appellant, by this contract, and by the use subsequently made by the public under the contract, gave to the public the right to use the station, the crossing was no longer merely a farm crossing, but it became either a public crossing, or it came within the provisions of the statute relative to depot grounds. In either event it became the duty of the appellant to protect its right of way so that stock could not go down the right of way and be injured by the cars, and if the statute had been complied with the accident in question would not have happened, and by reason of the fact that this was a public crossing and the statute was not complied with by appellant, the cause of action arose.

The statute provides that when such fencing or

cattle guards are not made, or when they are not kept in good repair, the railroad company shall be liable for all damages which may be done by the agents, engines or cars of the company. It is insisted by the appellant that this provision of the statute has been construed to mean that there can be no recovery unless the animal injured actually comes in contact with the train or car, and as there is no evidence that the interurban car struck the horse, for that reason appellee cannot recover. There is a line of cases which hold this to be the rule: *Chicago & N. W. R. Co. v. Taylor*, 8 Ill. App. 108; *Indiana, B. & W. R. Co. v. Schertz*, 12 Ill. App. 304; *Cannon v. Louisville, E. & St. L. Consol. R. Co.*, 34 Ill. App. 641; *Stump v. Chicago & G. W. Ry. Co.*, 84 Ill. App. 28; *Schertz v. Indianapolis, B. & W. R. Co.*, 107 Ill. 577. There is, however, an element in this case which was not in any of the cases cited, namely, the negligent and wilful misconduct on the part of the servants of the company. The evidence shows that as the interurban car approached the crossing, the motorman saw these horses on the track. He blew his whistle several times, but did not slacken the speed of his car, which was running ten or fifteen miles per hour. The horses started down the track running rapidly in the glare of the headlight. The speed of the car was not decreased, and the whistle continued to blow. There was plenty of room on either side of the track for the animals to escape, except that this space was filled with high weeds. Two of the animals did escape, but one of them continued down the track. The motorman knew of the location of this trestle and that a horse could not cross it without being injured, and yet he took no measures to stop his car, or even slacken its speed, but continued almost to the east end of the trestle. He had no right to deliberately run down this horse and injure it. It was his duty, not only for the safety of the horse but also for the safety of his car

and its passengers, to slacken its speed, and even stop the car, if necessary, in order to permit the frightened horse to escape. *Toledo, P. & W. Ry. Co. v. Bray,* 57 Ill. 514; *Iowa Cent. R. Co. v. Gushee,* 49 Ill. App. 609; *Toledo, St. L. & K. C. R. Co. v. Franklin,* 159 Ill. 99. The conduct of the motorman constituted wilful and wanton negligence and was sufficient, regardless of all other questions in the case, to entitle the appellee to recover.

The second instruction given on behalf of the appellee, after quoting the statute in regard to fencing and constructing cattle guards, told the jury that if they believed from the evidence that the horse got onto the right of way, and, due to the failure to construct and maintain cattle guards, ran west and got onto the trestle, then and in that event the railroad company was liable under the statute. The instruction calls for a directed verdict. It is contended by appellant that conceding all of the facts set out in this instruction to be true, they fail to show that appellant was liable, and therefore the instruction was erroneous. Counsel have not seen fit in their brief and argument to point out in what respect the instruction is defective, or what facts are omitted from the instruction which should have been included. In *People v. Hohimer,* 271 Ill. 515, it was held that the mere statement in the briefs that the court erred in giving a certain instruction amounted to no more than an assignment of error, and as no reasons were urged in support of the alleged error, it was waived. In *City of Benton v. Blake,* 259 Ill. 211, it was held that if counsel do not have sufficient confidence in their position to point out specifically wherein the alleged error exists, the reviewing court will not explore the record and the authorities to find some ground on which to reverse the judgment, and that rule was later approved in *People v. Kozel,* 303 Ill. 112. We are not called upon to speculate as to appellant's objection to this instruction, or

search for defects or omissions not specifically pointed out. That burden rests upon the appellant, and for these reasons we have not considered the complaint against the second instruction.

We find no reversible error, and the judgment will be affirmed.

*Judgment affirmed.*